Filed:  January 3, 2003

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 01-2340
(CA-00-86)

Stanley K. Young,

Plaintiff - Appellee,

versus

New Haven Advocate, et al.,

Defendants - Appellants.

O R D E R

The court amends its opinion filed December 13, 2002, as follows:

On page 8, first paragraph, line 3 -- the word "Advocate's" is corrected to read "Courant's."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

STANLEY K. YOUNG,
 *Plaintiff-Appellee,*

 v.

NEW HAVEN ADVOCATE; GAIL
THOMPSON; CAMILLE JACKSON;
HARTFORD COURANT; BRIAN TOOLAN;
AMY PAGNOZZI,
 *Defendants-Appellants,*

 and

MICHAEL LAWLOR; CAROLYN NAH;
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE;
CONNECTICUT POST; RICK SAWYERS;
KEN DIXON,       No. 01-2340
 *Defendants.*

ADVANCE PUBLICATIONS,
INCORPORATED; AMERICAN SOCIETY OF
NEWSPAPER EDITORS; ASSOCIATED
PRESS; ASSOCIATION OF ALTERNATIVE
NEWSWEEKLIES; BELO CORPORATION;
BLOOMBERG, L.P.; CENTER FOR
DEMOCRACY & TECHNOLOGY; DAILY
NEWS, L.P.; DOW JONES  AND
COMPANY, INCORPORATED; EL DIA,
INCORPORATED; THE E. W. SCRIPPS
COMPANY; THE HEARST CORPORATION;
INVESTIGATIVE REPORTERS AND
EDITORS, INCORPORATED; MAGAZINE
PUBLISHERS OF AMERICA;

THE MCCLATCHY COMPANY;
NATIONAL ASSOCIATION OF
BROADCASTERS; NEWSLETTER &
ELECTRONIC PUBLISHERS ASSOCIATION;
NEWSPAPER ASSOCIATION OF AMERICA;
THE NEW YORK TIMES; ONLINE NEWS
ASSOCIATION; THE RADIO-TELEVISION
NEWS DIRECTORS ASSOCIATION; THE

REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS; SOCIETY OF
PROFESSIONAL JOURNALISTS; VILLAGE
VOICE MEDIA, INCORPORATED; THE
WASHINGTON POST COMPANY; ZIFF
DAVIS MEDIA, INCORPORATED,
    *Amici Supporting Appellants.*

Appeal from the United States District Court
for the Western District of Virginia, at Big Stone Gap.
Glen M. Williams, Senior District Judge.
(CA-00-86)

Argued: June 3, 2002

Decided: December 13, 2002

Before MICHAEL and GREGORY, Circuit Judges, and
Bobby R. BALDOCK, Senior Circuit Judge of the
United States Court of Appeals for the Tenth Circuit,
sitting by designation.

Reversed by published opinion. Judge Michael wrote the opinion, in
which Judge Gregory and Senior Judge Baldock joined.

2

**COUNSEL**

**ARGUED:** Robert Douglass Lystad, BAKER & HOSTETLER,
L.L.P., Washington, D.C., for Appellants. Robert Stuart Collins,
FLEMING & COLLINS, P.C., Norton, Virginia, for Appellee. **ON
BRIEF:** Bruce W. Sanford, Bruce D. Brown, BAKER &
HOSTETLER, L.L.P., Washington, D.C.; Wade W. Massie, PENN,
STUART & ESKRIDGE, Abington, Virginia; Stephanie S. Abrutyn,
TRIBUNE COMPANY, New York, New York, for Appellants. Rob-
ert M. O'Neil, THOMAS JEFFERSON CENTER FOR THE PRO-
TECTION OF FREE EXPRESSION, Charlottesville, Virginia;
George Rutherglen, UNIVERSITY OF VIRGINIA LAW SCHOOL,
Charlottesville, Virginia, for Amici Curiae.

---

## OPINION

MICHAEL, Circuit Judge:

The question in this appeal is whether two Connecticut newspapers
and certain of their staff (sometimes, the "newspaper defendants")
subjected themselves to personal jurisdiction in Virginia by posting
on the Internet news articles that, in the context of discussing the
State of Connecticut's policy of housing its prisoners in Virginia insti-
tutions, allegedly defamed the warden of a Virginia prison. Our recent
decision in *ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293
F.3d 707 (4th Cir. 2002), supplies the standard for determining a
court's authority to exercise personal jurisdiction over an out-of-state
person who places information on the Internet. Applying that stan-
dard, we hold that a court in Virginia cannot constitutionally exercise
jurisdiction over the Connecticut-based newspaper defendants
because they did not manifest an intent to aim their websites or the
posted articles at a Virginia audience. Accordingly, we reverse the
district court's order denying the defendants' motion to dismiss for
lack of personal jurisdiction.

I.

Sometime in the late 1990s the State of Connecticut was faced with
substantial overcrowding in its maximum security prisons. To allevi-

3

ate the problem, Connecticut contracted with the Commonwealth of Virginia to house Connecticut prisoners in Virginia's correctional facilities. Beginning in late 1999 Connecticut transferred about 500 prisoners, mostly African-American and Hispanic, to the Wallens Ridge State Prison, a "supermax" facility in Big Stone Gap, Virginia. The plaintiff, Stanley Young, is the warden at Wallens Ridge. Connecticut's arrangement to incarcerate a sizeable number of its offenders in Virginia prisons provoked considerable public debate in Connecticut. Several Connecticut legislators openly criticized the policy, and there were demonstrations against it at the state capitol in Hartford.

Connecticut newspapers, including defendants the New Haven Advocate (the Advocate) and the Hartford Courant (the Courant), began reporting on the controversy. On March 30, 2000, the Advocate published a news article, written by one of its reporters, defendant Camille Jackson, about the transfer of Connecticut inmates to Wallens Ridge. The article discussed the allegedly harsh conditions at the Virginia prison and pointed out that the long trip to southwestern Virginia made visits by prisoners' families difficult or impossible. In the middle of her lengthy article, Jackson mentioned a class action that inmates transferred from Connecticut had filed against Warden Young and the Connecticut Commissioner of Corrections. The inmates alleged a lack of proper hygiene and medical care and the denial of religious privileges at Wallens Ridge. Finally, a paragraph at the end of the article reported that a Connecticut state senator had expressed concern about the presence of Confederate Civil War memorabilia in Warden Young's office. At about the same time the Courant published three columns, written by defendant-reporter Amy Pagnozzi, questioning the practice of relocating Connecticut inmates to Virginia prisons. The columns reported on letters written home by inmates who alleged cruelty by prison guards. In one column Pagnozzi called Wallens Ridge a "cut-rate gulag." Warden Young was not mentioned in any of the Pagnozzi columns.

On May 12, 2000, Warden Young sued the two newspapers, their editors (Gail Thompson and Brian Toolan), and the two reporters for libel in a diversity action filed in the Western District of Virginia. He claimed that the newspapers' articles imply that he "is a racist who advocates racism" and that he "encourages abuse of inmates by the

4

guards" at Wallens Ridge. Young alleged that the newspapers circulated the allegedly defamatory articles throughout the world by posting them on their Internet websites.

The newspaper defendants filed motions to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) on the ground that the district court lacked personal jurisdiction over them. In support of the motions the editor and reporter from each newspaper provided declarations establishing the following undisputed facts. The Advocate is a free newspaper published once a week in New Haven, Connecticut. It is distributed in New Haven and the surrounding area, and some of its content is published on the Internet. The Advocate has a small number of subscribers, and none of them are in Virginia. The Courant is published daily in Hartford, Connecticut. The newspaper is distributed in and around Hartford, and some of its content is published on the Internet. When the articles in question were published, the Courant had eight mail subscribers in Virginia. Neither newspaper solicits subscriptions from Virginia residents. No one from either newspaper, not even the reporters, traveled to Virginia to work on the articles about Connecticut's prisoner transfer policy. The two reporters, Jackson of the Advocate and Pagnozzi of the Courant, made a few telephone calls into Virginia to gather some information for the articles. Both interviewed by telephone a spokesman for the Virginia Department of Corrections. All other interviews were done with people located in Connecticut. The two reporters wrote their articles in Connecticut. The individual defendants (the reporters and editors) do not have any traditional contacts with the Commonwealth of Virginia. They do not live in Virginia, solicit any business there, or have any assets or business relationships there. The newspapers do not have offices or employees in Virginia, and they do not regularly solicit or do business in Virginia. Finally, the newspapers do not derive any substantial revenue from goods used or services rendered in Virginia.

In responding to the declarations of the editors and reporters, Warden Young pointed out that the newspapers posted the allegedly defamatory articles on Internet websites that were accessible to Virginia residents. In addition, Young provided copies of assorted printouts from the newspapers' websites. For the Advocate, Young submitted eleven pages from newhavenadvocate.com and newmassmedia.com for January 26, 2001. The two pages from newha-

venadvocate.com are the Advocate's homepage, which includes links to articles about the "Best of New Haven" and New Haven's park police. The nine pages from newmassmedia.com, a website maintained by the publishers of the Advocate, consist of classified advertising from that week's newspapers and instructions on how to submit a classified ad. The listings include advertisements for real estate rentals in New Haven and Guilford, Connecticut, for roommates wanted and tattoo services offered in Hamden, Connecticut, and for a bassist needed by a band in West Haven, Connecticut. For the Courant, Young provided nine pages from hartfordcourant.com and ctnow.com for January 26, 2001. The hartfordcourant.com homepage characterizes the website as a "source of news and entertainment in and about Connecticut." A page soliciting advertising in the Courant refers to "exposure for your message in this market" in the "best medium in the state to deliver your advertising message." The pages from ctnow.com, a website produced by the Courant, provide news stories from that day's edition of the Courant, weather reports for Hartford and New Haven, Connecticut, and links to sites for the University of Connecticut and Connecticut state government. The website promotes its online advertising as a "source for jobs in Connecticut." The website printouts provided for January 26, 2001, do not have any content with a connection to readers in Virginia.

The district court denied the newspaper defendants' motions to dismiss, concluding that it could exercise personal jurisdiction over them under Virginia's long-arm statute, Va. Code Ann. § 8.01-328(A)(3), because "the defendants' Connecticut-based Internet activities constituted an act leading to an injury to the plaintiff in Virginia." The district court also held that the defendants' Internet activities were sufficient to satisfy the requirements of constitutional due process. With our permission the newspaper defendants are taking this interlocutory appeal. The facts relating to jurisdiction are undisputed, and the district court's decision that it has personal jurisdiction over these defendants presents a legal question that we review de novo. *See Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001).

II.

A.

A federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. *See ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997); Fed. R. Civ. P. 4(k)(1)(A). Because Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause, *see English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990), "the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996). The question, then, is whether the defendant has sufficient "minimum contacts with [the forum] such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). A court may assume power over an out-of-state defendant either by a proper "finding [of] specific jurisdiction based on conduct connected to the suit or by [a proper] finding [of] general jurisdiction." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711 (4th Cir. 2002). Warden Young argues only for specific jurisdiction, so we limit our discussion accordingly. When a defendant's contacts with the forum state "are also the basis for the suit, those contacts may establish specific jurisdiction." *Id.* at 712. In determining whether specific jurisdiction exists, we traditionally ask (1) whether the defendant purposefully availed itself of the privileges of conducting activities in the forum state, (2) whether the plaintiff's claim arises out of the defendant's forum-related activities, and (3) "whether the exercise of personal jurisdiction over the defendant would be constitutionally reasonable." *Id.* at 712. *See also Christian Sci. Bd.*, 259 F.3d at 216. The plaintiff, of course, has the burden to establish that personal jurisdiction exists over the out-of-state defendant. *Young v. FDIC*, 103 F.3d 1180, 1191 (4th Cir. 1997).

B.

We turn to whether the district court can exercise specific jurisdiction over the newspaper defendants, namely, the two newspapers, the two editors, and the two reporters. To begin with, we can put aside

7

the few Virginia contacts that are not Internet based because Warden Young does not rely on them. Thus, Young does not claim that the reporters' few telephone calls into Virginia or the Courant's eight Virginia subscribers are sufficient to establish personal jurisdiction over those defendants. Nor did the district court rely on these traditional contacts.

Warden Young argues that the district court has specific personal jurisdiction over the newspaper defendants (hereafter, the "newspapers") because of the following contacts between them and Virginia: (1) the newspapers, knowing that Young was a Virginia resident, intentionally discussed and defamed him in their articles, (2) the newspapers posted the articles on their websites, which were accessible in Virginia, and (3) the primary effects of the defamatory statements on Young's reputation were felt in Virginia. Young emphasizes that he is not arguing that jurisdiction is proper in any location where defamatory Internet content can be accessed, which would be anywhere in the world. Rather, Young argues that personal jurisdiction is proper in Virginia because the newspapers understood that their defamatory articles, which were available to Virginia residents on the Internet, would expose Young to public hatred, contempt, and ridicule in Virginia, where he lived and worked. As the district court put it, "[t]he defendants were all well aware of the fact that the plaintiff was employed as a warden within the Virginia correctional system and resided in Virginia," and they "also should have been aware that any harm suffered by Young from the circulation of these articles on the Internet would primarily occur in Virginia."

Young frames his argument in a way that makes one thing clear: if the newspapers' contacts with Virginia were sufficient to establish personal jurisdiction, those contacts arose solely from the newspapers' Internet-based activities. Recently, in *ALS Scan* we discussed the challenges presented in applying traditional jurisdictional principles to decide when "an out-of-state citizen, through electronic contacts, has conceptually `entered' the State via the Internet for jurisdictional purposes." *ALS Scan*, 293 F.3d at 713. There, we held that "specific jurisdiction in the Internet context may be based only on an out-of-state person's Internet activity directed at [the forum state] and causing injury that gives rise to a potential claim cognizable in [that state]." *Id.* at 714. We noted that this standard for determining

8

specific jurisdiction based on Internet contacts is consistent with the one used by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984). *ALS Scan*, 293 F.3d at 714. *Calder*, though not an Internet case, has particular relevance here because it deals with personal jurisdiction in the context of a libel suit. In *Calder* a California actress brought suit there against, among others, two Floridians, a reporter and an editor who wrote and edited in Florida a National Enquirer article claiming that the actress had a problem with alcohol. The Supreme Court held that California had jurisdiction over the Florida residents because "California [was] the focal point both of the story and of the harm suffered." *Calder*, 465 U.S. at 789. The writers' "actions were expressly aimed at California," the Court said, "[a]nd they knew that the brunt of [the potentially devastating] injury would be felt by [the actress] in the State in which she lives and works and in which the National Enquirer has its largest circulation," 600,000 copies. *Calder*, 465 U.S. at 789-90.

Warden Young argues that *Calder* requires a finding of jurisdiction in this case simply because the newspapers posted articles on their Internet websites that discussed the warden and his Virginia prison, and he would feel the effects of any libel in Virginia, where he lives and works. *Calder* does not sweep that broadly, as we have recognized. For example, in *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625-26 (4th Cir. 1997), we emphasized how important it is in light of *Calder* to look at whether the defendant has expressly aimed or directed its conduct toward the forum state. We said that "[a]lthough the place that the plaintiff feels the alleged injury is plainly relevant to the [jurisdictional] inquiry, it must ultimately be accompanied by the defendant's own [sufficient minimum] contacts with the state if jurisdiction . . . is to be upheld." *Id.* at 626. We thus had no trouble in concluding in *ALS Scan* that application of *Calder* in the Internet context requires proof that the out-of-state defendant's Internet activity is expressly targeted at or directed to the forum state. *ALS Scan*, 293 F.3d at 714. In *ALS Scan* we went on to adapt the traditional standard (set out in part II.A., *supra* ) for establishing specific jurisdiction so that it makes sense in the Internet context. We "conclude[d] that a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3)

9

that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *ALS Scan*, 293 F.3d at 714.

When the Internet activity is, as here, the posting of news articles on a website, the *ALS Scan* test works more smoothly when parts one and two of the test are considered together. We thus ask whether the newspapers manifested an intent to direct their website content — which included certain articles discussing conditions in a Virginia prison — to a Virginia audience. As we recognized in *ALS Scan*, "a person's act of placing information on the Internet" is not sufficient by itself to "subject[ ] that person to personal jurisdiction in each State in which the information is accessed." *Id.* at 712. Otherwise, a "person placing information on the Internet would be subject to personal jurisdiction in every State," and the traditional due process principles governing a State's jurisdiction over persons outside of its borders would be subverted. *Id.See also GTE New Media Servs. Inc. v. Bellsouth Corp.*, 199 F.3d 1343, 1350 (D.C. Cir. 2000). Thus, the fact that the newspapers' websites could be accessed anywhere, including Virginia, does not by itself demonstrate that the newspapers were intentionally directing their website content to a Virginia audience. Something more than posting and accessibility is needed to "indicate that the [newspapers] purposefully (albeit electronically) directed [their] activity in a substantial way to the forum state," Virginia. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998) (quotation omitted). The newspapers must, through the Internet postings, manifest an intent to target and focus on Virginia readers.

We therefore turn to the pages from the newspapers' websites that Warden Young placed in the record, and we examine their general thrust and content. The overall content of both websites is decidedly local, and neither newspaper's website contains advertisements aimed at a Virginia audience. For example, the website that distributes the Courant, ctnow.com, provides access to local (Connecticut) weather and traffic information and links to websites for the University of Connecticut and Connecticut state government. The Advocate's website features stories focusing on New Haven, such as one entitled "The Best of New Haven." In sum, it appears that these newspapers maintain their websites to serve local readers in Connecticut, to expand the reach of their papers within their local markets, and to

10

provide their local markets with a place for classified ads. The websites are not designed to attract or serve a Virginia audience.

We also examine the specific articles Young complains about to determine whether they were posted on the Internet with the intent to target a Virginia audience. The articles included discussions about the allegedly harsh conditions at the Wallens Ridge prison, where Young was warden. One article mentioned Young by name and quoted a Connecticut state senator who reported that Young had Confederate Civil War memorabilia in his office. The focus of the articles, however, was the Connecticut prisoner transfer policy and its impact on the transferred prisoners and their families back home in Connecticut. The articles reported on and encouraged a public debate in Connecticut about whether the transfer policy was sound or practical for that state and its citizens. Connecticut, not Virginia, was the focal point of the articles. *Cf. Griffis v. Luban*, 646 N.W.2d 527, 536 (Minn. 2002) ("The mere fact that [the defendant, who posted allegedly defamatory statements about the plaintiff on the Internet] knew that [the plaintiff] resided and worked in Alabama is not sufficient to extend personal jurisdiction over [the defendant] in Alabama, because that knowledge does not demonstrate targeting of Alabama as the focal point of the . . . statements.").

The facts in this case establish that the newspapers' websites, as well as the articles in question, were aimed at a Connecticut audience. The newspapers did not post materials on the Internet with the manifest intent of targeting Virginia readers. Accordingly, the newspapers could not have "reasonably anticipate[d] being haled into court [in Virginia] to answer for the truth of the statements made in their article[s]." *Calder*, 465 U.S. at 790 (quotation omitted). In sum, the newspapers do not have sufficient Internet contacts with Virginia to permit the district court to exercise specific jurisdiction over them.*

---

* Because the newspapers did not intentionally direct Internet activity to Virginia, and jurisdiction fails on that ground, we have no need to explore the last part of the *ALS Scan* inquiry, that is, whether the challenged conduct created a cause of action in Virginia. *See ALS Scan*, 293 F.3d at 714.

11

We reverse the order of the district court denying the motions to dismiss for lack of personal jurisdiction made by the New Haven Advocate, Gail Thompson (its editor), and Camille Jackson (its reporter) and by the Hartford Courant, Brian Toolan (its editor), and Amy Pagnozzi (its reporter).

*REVERSED*

12